**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Robert E. Blackburn**

Civil Action No. 13-cv-03326-REB-CBS

DR. JAMES C. DOBSON, and
FAMILY TALK,

      Plaintiffs,

v.

KATHLEEN SEBELIUS, in her official capacity as Secretary of the United States
Department of Health and Human Services;
THOMAS E. PEREZ, in his official capacity as Secretary of the United States
Department of Labor;
JACOB J. LEW, in his official capacity as Secretary of the United States Department of
the Treasury;
UNITED STATES DEPARTMENT OF HEALTH AND
HUMAN SERVICES;
UNITED STATES DEPARTMENT OF LABOR; and
UNITED STATES DEPARTMENT OF THE TREASURY,

      Defendants.

---

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

**Blackburn, J.**

      This matter is before me on the **Plaintiffs' Motion for Preliminary Injunction
and Certificate of Compliance re: Consultation on Motion** [#18][1] filed January 21,
2014.  The defendants filed a response [#30], and the plaintiffs filed a reply [#36].  In
addition, the defendants filed a notice of supplemental authority [#34].  Having
considered carefully all relevant evidence educed, all reasons stated, all arguments
advanced, all authorities cited, and all apposite law, I find and conclude that the motion

---

[1]  "[#18]" is an example of the convention I use to identify the docket number assigned to a
specific paper by the court's case management and electronic case filing system (CM/ECF). I use this
convention throughout this order.

for preliminary injunction should be granted.[2]

## I. JURISDICTION

I have jurisdiction over this case under 28 U.S.C. § 1331 (federal question).

## II. BACKGROUND

The plaintiffs, Dr. James C. Dobson and Family Talk, challenge certain requirements imposed on group health plans by the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010) (Affordable Care Act or ACA). Specifically, the plaintiffs challenge the requirement that the group health plan for employees of Family Talk or, in the alternative, another entity, provide coverage for drugs, devices, procedures, or related education and counseling that may destroy human life after fertilization of the egg of a mother and either before or after the implantation of a fertilized egg in the uterus of its mother.  The plaintiffs contend that any participation by them in the implementation of this required coverage imposes a substantial burden on the exercise of their religious beliefs and violates their rights under the First Amendment of the Constitution of the United States and under the Religious Freedom Restoration Act (RFRA)[3].

> Family Talk is a religious corporation "formed for the express purposes of spreading and propagating the Gospel of Jesus Christ and to provide Christ-oriented advice, counsel, guidance and education to parents and children and to speak to cultural issues that affect the family." Family Talk believes that God has condemned the intentional destruction of innocent human life. Family Talk holds, as a matter of religious conviction, that it would be sinful and immoral for the organization intentionally to participate in, pay for, facilitate, enable, or otherwise support access to abortion or early destruction of human life. Family Talk holds that one of the prohibitions of the Ten Commandments ("thou shalt

---

[2]   The issues raised by and inherent to the motion are sufficiently briefed; thus, obviating the necessity for evidentiary hearing or oral argument.

[3]   42 U.S.C. §§ 2000bb through 2000bb-4.

not murder") precludes them from facilitating, assisting in, or enabling the coverage of arrangements for payments for drugs that can and do destroy very young human beings in the womb.

*Verified Complaint* [#1], filed December 10, 2013, ¶ 3.

> Dr. James C. Dobson is a believing and practicing Evangelical Christian.  Dr. Dobson is the Founder, President and Chairman of the Board of Directors of Family Talk.  Dr. Dobson and Family Talk morally reject, as an abortion, the prevention of implantation of an early human embryo, and therefore they oppose the facilitation of "contraceptives" that can cause such an effect.

*Id.*, ¶ 2.  Dr. Dobson executed the verification in the **Verified Complaint** [#1], at page 51.

The ACA requires many health insurance plans to provide coverage for women's "preventative care and screenings [as] . . . provided for in comprehensive guidelines supported by the Health Resources and Services Administration[.]" See 42 U.S.C. § 300gg - 13(a)(4).  The details of this requirement are expatiated in regulations adopted to implement the statutory requirement. 29 C.F.R. § 147.130 (a)(1)(iv) states the basic requirement, with reference to other resources for the details.  This requirement now includes "all Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity."  Health Resources & Services Administration, "Women's Preventive Services Guidelines," www.hrsa.gov/womensguidelines (visited April 10, 2014).  I will refer to this aspect of the ACA and regulations as the Preventative Care Coverage Requirement.

The plaintiffs object to a portion of the Preventative Care Coverage Requirement. The religious objections of the plaintiffs are limited to coverage for drugs, devices, or procedures that may destroy human life after fertilization of the egg of a mother and

either before or after the implantation of a fertilized egg in the uterus of its mother, as

well as any related counseling or education.  The objections of the plaintiffs include

surgical abortion, the so-called morning after pill, also know as Plan B, the week afer

pill, also known as ella, and intra uterine devices.[4]

After the enactment of the ACA, the government adopted administrative

regulations which provide a religious exemption from the Preventative Care Coverage

Requirement.  The current regulations provide an exemption from the Preventative

Care Coverage Requirement for organizations like Family Talk.  The exemption relevant

to this case includes the following four criteria, all of which must be satisfied for the

exemption to be applicable:

> (1) The organization opposes providing coverage for some or all of any contraceptive services required to be covered under § 147.130(a)(1)(iv) on account of religious objections.

> (2) The organization is organized and operates as a nonprofit entity.

> (3) The organization holds itself out as a religious organization.

> (4) The organization self-certifies, in a form and manner specified by the Secretary, that it satisfies the criteria in paragraphs (b)(1) through (3) of this section, and makes such self-certification available for examination upon request by the first day of the first plan year to which the accommodation in paragraph (c) of this section applies. The self-certification must be executed by a person authorized to make the certification on behalf of the organization, and must be maintained in a manner consistent with the record retention requirements under section 107 of the Employee Retirement Income Security Act of 1974.

29 C.F.R. § 2590.715-2713A.  An organization that satisfies these quadripartite criteria

is considered an "eligible organization."  Under 29 C.F.R. § 2590.715-2713A (b), an

eligible organization is deemed to have complied with the requirements of the

---

[4] I refer to this portion of the coverage requirement as the "Mandate."

Preventative Care Coverage Requirement.  An eligible organization is "not required to contract, arrange, pay, or refer for contraceptive coverage . . . ."  See Coverage of Certain Preventive Services Under the Affordable Care Act, 78 FR 39870-01, 39874 (section II(B)(2)).

The process necessary to invoke the exemption is relatively simple.  The organization seeking the exemption must complete and execute a short form certifying that it meets the first three criteria.  The form, titled EBSA Form 700 - Certification,[5] requires the organization to provide its name, the name of the individual authorized to make the certification for the organization, and the mailing address, email address, and phone number for that individual.[6]  In the case of an organization with a self-insured health plan, such as Family Talk, the organization must deliver the Exemption Form to the third-party administrator (TPA) of its plan along with a list of the employees of the organization.

Once the Exemption Form is properly completed, executed, and delivered, the eligible organization is not obligated to comply with the Mandate and is not obligated to administer or pay for the coverages required by the Mandate.  Rather, the Exemption Form "shall be treated as a designation of the third party administrator as the plan administrator" for any "contraceptive services required to be covered" under the Preventative Care Coverage Requirement "to which the eligible organization objects on religious grounds . . . ."  29 C.F.R. § 2510.3-16 (b).  The TPA then is obligated to provide or arrange for separate payments for contraceptive services for persons insured

---

[5]  Hereinafter the "Exemption Form."

[6]  The form can be viewed at dol.gov/ebsa/pdf/preventiveserviceseligibleorganizationcertificationform.pdf.

by the plan as required by the ACA.  The TPA is reimbursed for costs it incurs when it provides such coverage.

After the TPA receives the Exemption Form, it must notify female employees who are covered by the health plan of the eligible organization that the TPA will cover and administer the preventive services required by the ACA, including the services that are the subject of the Mandate.  29 C.F.R. § 2590.715-2713A (d).  Self-insured eligible organizations "must not, directly or indirectly, seek to interfere with a third party administrator's arrangements to provide or arrange separate payments for contraceptive services for participants or beneficiaries, and must not, directly or indirectly, seek to influence the third party administrator's decision to make any such arrangements."  29 C.F.R. § 2590.715-2713A (b)(1)(iii).

In short, when an eligible organization properly completes, executes, and delivers the Exemption Form, the organization is not obligated to comply with the Mandate.  The organization is not required to administer or fund health insurance coverages required by the Mandate.  Instead, the third party administrator of the health plan of the organization must arrange to provide those coverages.

The next plan year for the Family Talk employee health insurance plan begins on May 1, 2014.  According to the plaintiffs, they now face a choice: (1) they can violate their religious beliefs and provide the health insurance coverage required by the Mandate; (2) they can violate their religious beliefs and stop providing health insurance coverage for the employees of Family Talk; (3) they can continue to provide health insurance coverage without the coverages required by the Mandate – and face prodigious penalties; or (4) they can violate their sincerely held religious beliefs and complete, execute, and deliver the Exemption Form.

In the view of the plaintiffs, the fourth option, the Exemption Form, triggers a process which facilitates and enables the provision of the religiously objectionable insurance coverages required by the Mandate.  Taking an action which initiates such a process, the plaintiffs contend, violates their religious beliefs.  Notably, failure to provide the coverages required by the Mandate, failure to execute the Exemption Form, and cancellation of the health insurance plan of Family Talk to avoid the Mandate subjects Family talk to substantial, if not ruinous, financial penalties.  ***See Roman Catholic Archdiocese of Atlanta v. Sebelius,*** 2014 WL 1256373, *4 (N.D. Ga. Mar. 26, 2014).

### III.  STANDING

In the view of the defendants, Dr. Dobson does not have standing to challenge the Mandate.  "[T]he irreducible constitutional minimum of standing" requires that a plaintiff (1) have suffered an injury in fact, (2) that is caused by the defendant's conduct, and (3) that is likely to be redressed by a favorable ruling. ***Lujan v. Defenders of Wildlife,*** 504 U.S. 555, 560 (1992).  As to the injury prong, a plaintiff must demonstrate that he has "suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." ***Id***. at 560 (quotations omitted). The requirement of a causal connection between the defendant's conduct and the plaintiff's injury means that the injury must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." ***Id***. (citation omitted).

The defendants contend that Dr. Dobson cannot show that he is injured by the Mandate, arguing that the Mandate does not apply to Dr. Dobson as an individual.  The defendants assert that the Mandate applies only to "group health plans" and "health insurance issuers."  42 U.S.C. § 300gg-13; 45 C.F.R. § 147.130(a)(1).  Although the

Mandate does not, on its face, apply directly against Dr. Dobson, I conclude that he has standing to assert the challenge to the Mandate which he asserts in this case.

A plurality of judges in **Hobby Lobby Stores, Inc. v. Sebelius**,[7] rejected a similar argument that the founders, executives, and directors of Hobby Lobby Stores, Inc., the Greens, lacked standing to seek relief from the mandate imposed on  the corporation which they lead and operate:

> (I)t is beyond question that the Greens have Article III standing to pursue their claims individually. This is so not simply because the company shares of which they are the beneficial owners would decline in value if the mandate's penalties for non-compliance were enforced, though that alone would satisfy Article III. **See Franchise Tax Bd. of Cal. v. Alcan Aluminium Ltd.,** 493 U.S. 331, 336, 110 S.Ct. 661, 107 L.Ed.2d 696 (1990); **Grubbs v. Bailes,** 445 F.3d 1275, 1280 (10th Cir.2006). It is also because the mandate infringes the Greens' religious liberties by requiring them to lend what their religion teaches to be an impermissible degree of assistance to the commission of what their religion teaches to be a moral wrong. This sort of governmental pressure to compromise an article of religious faith is surely sufficient to convey Article III standing to the Greens, as it was for the plaintiffs in **Thomas** and **Lee** and in so many other religious liberty cases. Certainly our sister circuits have had no trouble finding Article III standing in similar cases where, say, individual pharmacists sought to contest regulations requiring their employers to dispense some of the same drugs or devices challenged here, **see Stormans, Inc. v. Selecky,** 586 F.3d 1109, 1121 (9th Cir.2009), or where individual soldiers sought to challenge military rules prohibiting their on-base day-care providers from including religious practices in their programs, **see Hartmann v. Stone**, 68 F.3d 973, 979 n. 4 (6th Cir.1995).

*Id*. at 1153 - 1154 (concurring opinion of Judge Gorsuch, joined by Judges Kelly and Tymkovich; *see also* opinion of Judge Matheson, concurring in part and dissenting in part, 723 F.3d at 1184 - 1188).

Given the nature and extent of the role of Dr. Dobson in the Family Talk organization, the same analysis is apposite.  The attempt to distinguish and separate

---

[7]  723 F.3d 1114 (10th Cir. 2013), *cert. granted*, ___ U.S. ___, 134 S. Ct. 678, 187 L. Ed. 2d 544 (2013).

Dr. Dobson from Family Talk is factitious. These plaintiffs enjoy a Siamese-like joinder, characterized by an indistinguishable coincidence of religious and moral purpose and philosophy.  To affect one is to ineluctably affect the other.  Thus, I conclude that Dr. Dobson has Article III standing to mount the challenge to the Mandate which he asserts in this case.

## IV.  PRELIMINARY INJUNCTION - STANDARD OF REVIEW

FED. R. CIV. P. 65 authorizes federal courts to issue preliminary injunctions. Because a preliminary injunction is an extraordinary remedy, the right of a party to such relief must be clear and unequivocal.  *See Federal Lands Legal Consortium ex rel. Robart Estate v. United States*, 195 F.3d 1190, 1194 (10th Cir. 1999).  The plaintiffs are entitled to a preliminary injunction only if they prove (1) that there is a substantial likelihood that they will prevail on the merits; (2) that they will suffer irreparable harm unless the preliminary injunction is issued; (3) that the threatened injury to the plaintiffs outweighs the harm the preliminary injunction might cause defendants; and (4) that the preliminary injunction is in the public interest.  *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1246 (10th Cir. 2001).

## V. ANALYSIS

### A.  LIKELIHOOD OF SUCCESS

To secure a preliminary injunction, a plaintiff must establish a substantial likelihood that it is likely to prevail on the merits of the substantive claim or claims that are the basis for its motion.  *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1246 (10th Cir. 2001).  However, "[t]he determination of a motion for a preliminary injunction and a decision on the merits are different." *Valdez v. Applegate*, 616 F.2d 570, 572 (10th Cir. 1980).  "It is not necessary that plaintiffs show positively that they will

prevail on the merits before a preliminary injunction may be granted." ***Atchison,***

***Topeka and Santa Fe Railway. Co. v. Lennen***, 640 F.2d 255, 261 (10th Cir. 1981).

Instead, a plaintiff need only establish "a reasonable probability of success, . . . not an

'overwhelming' likelihood of success[.]" ***Id.***

The plaintiffs assert claims under the Religious Freedom Restoration Act, the

Establishment Clause of the First Amendment, the Free Exercise Clause of the First

Amendment, and the Free Speech Clause of the First Amendment.  I conclude that the

plaintiffs have shown a reasonable probability of success, and, thus, a substantial

likelihood, that they will prevail on their RFRA claim.  As a result, I do not analyze this

factor as to their other claims.[8]

### 1.  RFRA - Substantial Burden

Under the RFRA, the "Government shall not substantially burden a person's

exercise of religion."  42 U.S.C. § 2000bb-1(a). To prevail on a claim under this section

of the RFRA, the plaintiffs must show: (1) they wish to engage in a religious exercise;

(2) which is motivated by a sincerely held belief; and (3) which exercise is subject to a

substantial burden imposed by the government.  ***See Abdulhaseeb v. Calbone***, 600

F.3d 1301, 1312 (10th Cir. 2010) (applying the Religious Land Use and Institutionalized

Persons Act).  The term "substantial burden," as used in the Religious Land Use and

Institutionalized Persons Act (RLUIPA), addressed in ***Abdulhaseeb***, is to be interpreted

by reference to the Religious Freedom Restoration Act of 1993.  ***Grace United***

***Methodist Church v. City Of Cheyenne***, 451 F.3d 643, 661 (10th Cir. 2006).  Under

either act, the substantial burden standard is the same.

---

[8] "A fundamental and longstanding principle of judicial restraint requires that courts avoid
reaching constitutional questions in advance of the necessity of deciding them."  ***Lyng v. Nw. Indian
Cemetery Protective Ass'n***, 485 U.S. 439, 445 (1988).

To evaluate the RFRA claim of the plaintiffs, the court must identify the apposite religious belief, determine whether such belief is sincere, and decide whether the government, via the Mandate, has placed "substantial pressure on the religious believer." *Hobby Lobby*, 723 F.3d at 1140.  In this case, the relevant religious beliefs of the plaintiffs are summarized in paragraph three of the **Verified Complaint** [#1], quoted above.  There is no dispute that these beliefs are religious beliefs, and there is no dispute that these beliefs are sincerely held religious beliefs of the plaintiffs. Thus, only the third factor is at issue: whether the government has imposed a substantial burden on the relevant exercise of religion.

To determine if a burden is substantial, a court must determine if the burden puts "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Abdulhaseeb*, 600 F.3d at 1315 (internal quotation and citation omitted).  The government imposes a substantial burden on religious exercise if it (1) requires participation in an activity prohibited by a sincerely held religious belief; (2) prevents participation in conduct motivated by a sincerely held religious belief; or (3) places substantial pressure on an adherent to engage in conduct contrary to a sincerely held religious belief.  *Hobby Lobby*, 723 F.3d at 1138.

Under the ACA and the concomitant regulations, Family Talk has essentially four options.  It may (1) refuse to provide employee health insurance coverage; or (2) provide the coverage required under the Mandate; or (3) provide a health insurance plan for its employees that does not include the coverages required by the Mandate; or (4) execute and deliver the Exemption Form and declare itself to be exempt from the Mandate.  Plaintiffs assert that the first and second options would violate their religious beliefs.  Additionally, option one would subject Family Talk to prohibitive financial

penalties.  Option three would be a violation of the ACA and would subject Family Talk to ruinous penalties.  Thus, Family Talk is essentially constrained to consider the fourth option – whether to seek exemption status.

However, the plaintiffs contend that completion, execution, and delivery of the Exemption Form would violate their religious beliefs.  This is true, according to the plaintiffs, because execution and delivery of the Exemption Form facilitates or enables a process which results in the provision of the coverages required by the Mandate to the employees of Family Talk.  Taking an action which initiates and facilitates such a process, the plaintiffs contend, violates their religious beliefs. Thus, the plaintiffs contend, the government has given them a Hobson's choice: violate their sincerely held religious beliefs or face ruinous financial penalties.  This choice, the plaintiffs assert, exerts and constitutes a substantial – and thus impermissible – burden on the exercise of their religion.

Courts have lined up on opposites sides of the debate. For example, in ***Zubik v. Sebelius***, ___ F. Supp. 2d ___, 2013 WL 6118696 (W.D. Pa. Nov. 21, 2013), the court addressed an exemption for a religious organization under the ACA.  As in this case, the plaintiffs in ***Zubik*** asserted that the affirmative acts of signing the Exemption Form stating the religious objections of the plaintiffs, compiling a list of the employees of the organization, and providing those items to its heath insurer or third-party administrator is an action which imposes a substantial burden on their exercise of religion.  Referring to the exemption process as the "accommodation," the court agreed:

> (U)nder the "accommodation," the reason the documentation is required is so that contraceptive products, services, and counseling can be provided in direct contravention of Plaintiffs' sincerely-held religious beliefs. The Government is asking Plaintiffs for documentation for what Plaintiffs sincerely believe is an immoral purpose, and thus, they cannot provide it.

*Id*. at *25.

> (A)lthough the "accommodation" legally enables Plaintiffs to avoid directly paying for the portion of the health plan that provides contraceptive products, services, and counseling, the "accommodation" requires them to shift the responsibility of purchasing insurance and providing contraceptive products, services, and counseling, onto a secular source. The Court concludes that Plaintiffs have a sincerely-held belief that "shifting responsibility" does not absolve or exonerate them from the moral turpitude created by the "accommodation"; to the contrary, it still substantially burdens their sincerely-held religious beliefs.

*Id*.

However, the holding in ***Univ. of Notre Dame v. Sebelius***, 743 F.3d 547 (7th Cir. 2014), is to the contrary. In ***Notre Dame***, the Seventh Circuit held that execution and delivery of the Exemption Form does not trigger or enable the objectionable coverage and does not constitute a substantial burden on religion under the RFRA.

> The accommodation in this case consists in the organization's (that is, Notre Dame's) washing its hands of any involvement in contraceptive coverage, and the insurer and the third-party administrator taking up the slack under compulsion of federal law. Notre Dame is telling [its health insurance providers]: "we're excused from the new federal obligation relating to contraception," and in turn, the government tells those insurance companies "but you're not."  This is a warning, not a trigger. It enables nothing. The sole "enabler" is the federal statute that Notre Dame has been allowed to opt out of.

*Id*. at 557.  "The delivery of a copy of the form to [a health insurance provider] reminds it of an obligation that the *law*, not the university, imposes on it - the obligation to pick up the ball if Notre Dame decides, as is its right, to drop it." *Id*. at 555.  In essence, the Seventh Circuit concluded that the religious objections of Notre Dame are to the independent action of the government in mandating contraceptive coverage, not to any action that the government has required Notre Dame to take. *Id*. at 559.

Analysis of the burden imposed on the religious beliefs of a plaintiff can bleed subtly into an assessment of the validity or credibility of those religious beliefs or the

sincerity of those beliefs.  Here, however, the existence and sincerity of the religious

beliefs of the plaintiffs is conceded. Thus, the fact and sincerity of the religious beliefs

of the plaintiffs is factually and legally inscrutable.  Any further assessment of the

validity or credibility of those religious beliefs by the court is not appropriate.  *United

States v. Lee*, 455 U.S. 252, 257 (1982) (It is not within the judicial function or judicial

competence to determine whether an appellee or the government has the proper

interpretation of the relevant religious faith; courts are not arbiters of scriptural

interpretation; citing *Thomas v. Review Bd. of Indiana Employment Security Div.*,

450 U.S. 707, 716 (1981)).

The plaintiffs in *Ave Maria Found. v. Sebelius*[9] also asserted that completing

the  Exemption Form would violate their religious beliefs.  Thus, they argued that the

pressure to complete the form, as imposed by the ACA and the regulations, constitutes

a substantial burden on their free exercise of religion.  The *Ave Maria* court found that it

could not question or contradict the nature of the religious beliefs stated by the

plaintiffs.

> How little Plaintiffs must do to qualify for the accommodation would
> be highly relevant if they objected only to paying for contraceptives
> directly. Taking a few minutes to complete some paperwork would hardly
> be a significant burden on their religious exercise. But because Plaintiffs
> also object to executing the self-certification, the government's argument
> amounts to disbelief that the self-certification has much religious
> significance. And adopting this argument would therefore require an
> examination of the sincerity of Plaintiffs' professed beliefs – which the
> government does not question – or second-guessing the importance or
> rationality of Plaintiffs' convictions – a task beyond the Court's ability or
> competence.

*Id*., ___ F. Supp. 2d at ___, 2014 WL 117425, *5 (E.D. Mich. Jan. 13, 2014).

---

[9] ___ F. Supp. 2d___, 2014 WL 117425  (E.D. Mich. Jan. 13, 2014).

> Courts may still evaluate whether a law pressures a litigant to modify her behavior and whether that pressure is significant. But having conceded that the accommodation requires Plaintiffs to change their behavior in some way – here, by executing a certification – the government cannot then label that newly required action as trivial.  It is not the government's business to decide what behavior has religious significance. Only when a law or regulation requires no action or forbearance by a religious objector can the government dismiss otherwise significant burdens on religious exercise offhand.

*Id*.

Given the particular facts described by Family Talk and Dr. Dobson, this court finds the ratiocination of the ***Zubik*** and ***Ave Maria*** courts to be more cogent than that described in ***Notre Dame***.  For the reasons summarized above, Family Talk and Dr. Dobson state credibly and cogently that providing the coverage required by the Mandate would violate their religious beliefs and execution and delivery of the Exemption Form, the EBSA Form 700 - Certification, which effectively exempts Family Talk from the Mandate, also would violate their sincerely held religious beliefs.  The enforcement scheme of the ACA imposes significant – if not ruinous – financial penalties on an organization which fails to provide the required coverage or, in the alternative, fails to execute and deliver the Exemption Form.  Conceivably, an organization might avoid the mandate by canceling its health insurance coverage. Family Talk and Dr. Dobson assert that dropping the Family Talk health insurance plan would be contrary to their religious beliefs.  *Complaint*, ¶ 133.[10]   I conclude that execution of any these three options would violate *per force* the sincerely held religious beliefs of the plaintiffs; yet the ACA essentially requires plaintiffs to choose among

---

[10]  Some organizations which might avoid the mandate by canceling their health insurance coverage are subject to financial penalties. ***See Roman Catholic Archdiocese of Atlanta v. Sebelius***, 2014 WL 1256373, *4 (N.D. Ga. Mar. 26, 2014).  Family Talk does not allege that it would be subject to such penalties.

them.

Here, any myopic focus on the brevity of the Exemption Form and its ease of completion misses the mark.  It is the *de facto* forced facilitation of the objectionable coverage that is religiously repugnant to the plaintiffs.[11] The resultant moral abhorrence is not effectively extenuated by a transfer of responsibility via an Exemption Form from the plaintiffs to the TPA.  For the plaintiffs, such legal legerdemain does not expiate the morally unacceptable means or end. The transformation of moral culpability from plaintiffs as principals to aiders and abettors does not absolve the plaintiffs from their immutable moral responsibility. Such a compelled concession – even by an ostensibly innocuous legal prophylactic – does not ameliorate the moral ignominy and obliquity created by the pressured participation in the process.

Further, it is of no moment that ultimately the decision by an employee to elect the objectionable coverage is optional. To the plaintiffs, it is the offer *per se* that is morally offensive regardless of the extent of its acceptance.

Thus, I conclude ultimately that there is a substantial likelihood that the plaintiffs can show that the pressure to execute the Exemption Form imposed on them by the ACA and the concomitant regulations constitutes impermissible pressure to act in violation of their religious beliefs.  This unavoidable circumstance effectively places substantial pressure on plaintiffs to engage in conduct contrary to sincerely held religious beliefs.  Accordingly, I conclude that the ACA and the regulations constitute a substantial burden on the exercise of religion of the plaintiffs.

---

[11]   To rehearse, to "facilitate, enable, or otherwise support access" to the objectionable coverage is a violation of plaintiffs' sincerely held religious beliefs. *Verified Complaint* [#1], ¶ 3, ¶¶ 127 - 130.

### 2.  RFRA - Compelling Governmental Interest & Least Restrictive Means

Under the RFRA, the government may impose a substantial burden on the exercise of religion under certain narrow circumstances.  The government "may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person – (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C.A. § 2000bb-1 (b).

In the view of the government, the ACA and the regulations "provide women who work for non-profit, religious organizations with access to contraceptive coverage without cost sharing, thereby advancing the compelling government interests in safeguarding public health and ensuring that women have equal access to health care. The defendants assert that the regulations advance these interests in a narrowly tailored fashion that does not require non-profit, religious organizations with religious objections to provid[e] contraceptive coverage to contract, pay, arrange, or refer for that coverage."  *Response* [#30], p. 6.

As the government notes candidly in its brief, the United States Court of Appeals for the Tenth Circuit has rejected these contentions. ***Hobby Lobby***, 723 F.3d at 1143 - 1144.  In ***Hobby Lobby*** the Tenth Circuit found that the interests articulated by the government are insufficient because they are broadly formulated interests justifying the general applicability of government mandates with "almost no justification for not granting specific exemptions to particular religious claimants."  ***Id***. at 1143 (citing ***Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal***, 546 U.S. 418, 431 (2006)).  In addition, the Tenth Circuit concluded that

the interest here cannot be compelling because the contraceptive -
coverage requirement presently does not apply to tens of millions of
people. As noted above, this exempted population includes those working
for private employers with grandfathered plans, for employers with fewer
than fifty employees, and, under a proposed rule, for colleges and
universities run by religious institutions. As the Supreme Court has said,
"a law cannot be regarded as protecting an interest of the highest order
when it leaves appreciable damage to that supposedly vital interest
unprohibited." [*Church of the Lukumi Babalu Aye, Inc. v. City of
Hialeah*, 508 U.S. 520, 547 (1993)]; *see also O Centro*, 546 U.S. at 433,
126 S.Ct. 1211 (citing *Lukumi* as instructive in determining whether
exemptions undermine a compelling government interest for purposes of
RFRA). The exemptions at issue here would yield precisely this result:
they would leave unprotected all women who work for exempted business
entities.

*Id*. at 1143 - 1144.[12]  Because there is no showing of compelling governmental interest,

I need not address the considerations of least restrictive means.

### 3.  Conclusion

The only issue in dispute concerning the RFRA claim of the plaintiffs is whether

the ACA and the regulations, as they relate to the plaintiffs and their possible exemption

from the Mandate, constitute a substantial burden on the religious beliefs of the

plaintiffs.  I have concluded that there is a substantial likelihood that the plaintiffs can

show that the ACA and the regulations constitute a substantial burden on the exercise

of their religion.  Contrastingly, the government has not shown that this substantial

burden is reasonably necessary to further a compelling governmental interest.  Thus,  I

conclude that the plaintiffs have shown a substantial likelihood of success on the merits

of their RFRA claim.

---

[12] This is, *a fortiori*, where, as here, many other mandated coverages have been effectively
delayed, revised, or negated.

## B.  IRREPARABLE INJURY

Establishing a likely violation of the rights of the plaintiffs under RFRA *ipso facto* establishes irreparable injury.  ***Hobby Lobby***, 723 F.3d at 1146.

## C.  BALANCE OF HARMS

When considering the balance of harms, a court must balance "the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  ***Amoco Prod. Co. v. Gambill***, 480 U.S. 531, 542 (1987).  In this case, a preliminary injunction would forestall the ability of the government to require that health insurance coverage of employees of Family Talk include coverage for drugs, devices, or procedures that may destroy human life after fertilization of the egg of a mother and either before or after the implantation of a fertilized egg in the uterus of its mother, as well as any related counseling or education.  However, no other coverages required by the Preventative Care Coverage Requirement would be affected by a preliminary injunction.  Thus, even with a preliminary injunction, a significant portion of the asserted interest of the government is realized while the sincerely held religious beliefs of the plaintiffs are preserved.  In contrast, absent an injunction, the plaintiffs would remain subject to a requirement that ostensibly constitutes a violation of their rights under federal law.  Accordingly, I find and conclude that the balance of equities weighs in favor of the plaintiffs.  ***See Hobby Lobby***, 723 F.3d at 1146 (plurality concluding balance of harms factor satisfied).

## D.  PUBLIC INTEREST

Generally, the public interest is served by enjoining the enforcement of a law that likely violates the Constitution.  ***Chamber of Commerce of U.S. v. Edmondson***, 594 F.3d 742, 771 (10th Cir. 2010).  Although a violation of the RFRA is not, on its face, a

violation of the constitution, "Congress has given RFRA similar importance by subjecting all subsequent congressional enactments to strict scrutiny unless those enactments explicitly exclude themselves from RFRA.  *See* 42 U.S.C. § 2000bb-3(b)." *See Hobby Lobby*, 723 F.3d at 1146 - 1147 (plurality concluding public interest factor satisfied).  Concerning the public interest, this case is directly analogous to *Hobby Lobby*.  Thus, I find and conclude that the public interest weighs in favor of the issuance of a preliminary injunction.

## E.  SECURITY

"The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  I conclude that security in the amount of five hundred (500) dollars is sufficient to satisfy this requirement.

## VI. ORDERS

**THEREFORE, IT IS ORDERED** as follows:

1.  That the **Plaintiffs' Motion for Preliminary Injunction and Certificate of Compliance re: Consultation on Motion** [#18] filed January 21, 2014, is **GRANTED** on the following terms;

2.  That effective forthwith, each of the defendants is **ENJOINED AND RESTRAINED** from any application or enforcement against the plaintiffs of any provision of 42 U.S.C. § 300gg-13(a)(4) and any regulations implementing that statutory provision to the extent the statute and the implementing regulations require the plaintiffs to include in the group health plan for employees of Family Talk coverage for drugs, devices, or procedures that may destroy a human embryo or fertilized egg of a mother

either before or after the implantation of a fertilized egg in the uterus of its mother, as well as any related counseling or education;

3.  That effective forthwith, each of the defendants is **ENJOINED AND RESTRAINED** from any application or enforcement against the plaintiffs of any provision of 42 U.S.C. § 300gg-13(a)(4) and any regulations implementing that statutory provision to the extent the statute and the implementing regulations require the plaintiffs to execute and deliver the EBSA Form 700 - Certification in order for the plaintiffs to obtain an exemption from the requirement that the plaintiffs include in the group health plan for employees of Family Talk coverage for drugs, devices, or procedures that may destroy a human embryo or fertilized egg of a mother either before or after the implantation of a fertilized egg in the uterus of its mother, as well as any related counseling or education;

4.  That effective forthwith, each of the defendants is **ENJOINED AND RESTRAINED** from any application or enforcement against the plaintiffs of any provision of 42 U.S.C. § 300gg-13(a)(4) and any regulations implementing that statutory provision to the extent the statute and the implementing regulations impose a penalty on the plaintiffs, or either of them, based on the failure or refusal of the plaintiffs (a) to execute and deliver the EBSA Form 700 - Certification; (b)  to include in the group health plan for Family Talk employees coverage for drugs, devices, or procedures that may destroy a human embryo or fertilized egg of a mother either before or after the implantation of a fertilized egg in the uterus of its mother, as well as any related counseling or education; or (c) to provide a group health plan covering the employees of Family Talk;

5.  That under FED. R. CIV. P. 65(c), the plaintiffs, Family Talk and Dr. James C.

Dobson, **SHALL POST** with the clerk of the court a bond or other security in the amount of five hundred (500) dollars by Monday, April 21, 2014, at 5:00 p.m. (mountain daylight time); and

6.  That this preliminary injunction **SHALL REMAIN IN EFFECT** until modified or rescinded by order of the court.

Dated April 17, 2014, at Denver, Colorado.

**BY THE COURT:**

Robert E. Blackburn
United States District Judge